# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **PAUL SHIFFLETT** | : | **CIVIL ACTION** |
| *Plaintiff* | : | |
| | : | **NO. 16-6537** |
| **v.** | : | |
| | : | |
| **JOSEPH KORSZNIAK,** *et al.* | : | |
| *Defendants* | : | |

NITZA I. QUIÑONES ALEJANDRO, J.                                                                                          NOVEMBER 8, 2022

## MEMORANDUM OPINION

**INTRODUCTION**

      In this civil rights action, Plaintiff Paul Shifflett, formerly incarcerated at SCI-Graterford, asserts that Defendants Dr. Muhammad Golsorkhi ("Dr. Golsorkhi") and Dr. Ferdinand Christian ("Dr. Christian") (collectively, "Moving Defendants") are liable to him under 42 U.S.C. § 1983 because they exhibited deliberate indifference to his serious medical needs by failing to prescribe him adequate pain medication following his jaw surgery and failing to ensure that he was provided his medications at the frequency prescribed.  Presently, before this Court is Moving Defendants' motion filed pursuant to Federal Rule of Civil Procedure ("Rule") 56, which seeks summary judgment on Plaintiff's civil rights claims on the grounds that Plaintiff has failed to present evidence sufficient to meet his summary judgment burden with respect to his claim of deliberate indifference.  [ECF 112].  Plaintiff opposes the motion.  [ECF 115].  The issues presented in the motion have been briefed by the parties and are ripe for disposition.  For the reasons stated herein, Moving Defendants' motion for summary judgment is granted.

**BACKGROUND**

When ruling on a motion for summary judgment, a court must consider all record evidence and supported relevant facts in the light most favorable to the non-movant—here, Plaintiff. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Galena v. Leone*, 638 F.3d 186, 196 (3d Cir. 2011). The facts relevant to Moving Defendants' motion are summarized as follows:[1]

> At all times relevant to Plaintiff's claims, Plaintiff was a prisoner at SCI-Graterford. On April 7, 2016, Plaintiff was taken to the prison dispensary, where he was seen by Dr. Golsorkhi. At that time, Plaintiff claimed that he had fallen down that night and complained of pain to his mandible, the lower jaw. An X-ray was performed which showed a fracture of the left angle mandible with a possible fracture of the right-angle mandible. A physical examination revealed swelling to the left side of Plaintiff's face and tenderness on both sides. As a result of these findings, Dr. Golsorkhi ordered that Plaintiff be sent to Temple University Hospital for evaluation. In anticipation of Plaintiff's eventual return to the prison, Dr. Lee Hanuschak submitted orders for Plaintiff to be housed in the infirmary for observation and to be prescribed antibiotics and Peridex mouthwash.[2]
>
> Later that day, Plaintiff was transferred to Temple University Hospital Emergency Room for treatment of a possible jaw fracture. Plaintiff presented to the Temple University Hospital Emergency Room with complaints of a questionable jaw fracture. Again, he reported that he fell off a bunk and hurt his jaw, although he later conceded that he was in an altercation with another inmate and was punched in the face. He complained that his pain was then 10/10 to both sides of his jaw. A physical examination confirmed swelling, tenderness, and inability to bite down. A CT scan was performed and showed acute fractures to the bilateral mandibular angles involving the sockets of the posterior-most mandibular molars and inferior alveolar canals. The emergency room physicians consulted with Dr. Pamela Roehm, an otolaryngologist ("ENT"), and a decision was made to admit Plaintiff to the ENT/Facial Trauma service.
>
> The next morning, April 8, 2016, Dr. Roehm performed surgery—a mandibular fixation and open reduction and internal fixation of left mandibular fracture, secondary to diagnosis of bilateral mandibular fractures with left full-thickness fracture and right partial thickness fracture. Plaintiff was discharged back to the prison later that evening. The discharge instructions included soft foods; the

---

[1] These facts are taken from the parties' briefs, exhibits, and statements of facts, where either admitted or supported by citation to record evidence. To the extent that any facts are disputed, such disputes will be noted and, if material, construed in Plaintiff's favor pursuant to Rule 56.

[2] Peridex is an antibacterial mouthwash.

2

use of Peridex, Clindamycin, Naproxen, and Percocet;[3] and follow-up at the ENT clinic in ten days.  Plaintiff's condition at discharge was noted to be "good."

Plaintiff returned to the prison on April 8, 2016, with a diagnosis of bilateral fractured mandible.  Pursuant to Dr. Hanuschak's orders, Plaintiff was placed in the infirmary for observation.  The nurse documented that she spoke with Dr. Christian, who entered orders for medications and soft food/liquid diet.  Dr. Christian further instructed the nursing staff to watch for signs of infection.  Dr. Christian prescribed the following medications on April 8, 2016:  Peridex (from April 8, 2016, through April 22, 2016); Cleocin/Clindamycin (from April 8, 2016, through April 22, 2016); Norco[4] 5/325mg four times per day (from April 8, 2016, through April 15, 2016); and Naproxen 375mg twice daily (from April 8, 2016, through April 15, 2016).

The next day, April 9, 2016, Plaintiff was seen on medical infirmary rounds by Jeanne DeFrangesco, CRNP.  Although the prison was not yet in possession of the Temple paperwork, Plaintiff advised CRNP DeFrangesco that he had undergone surgery for bilateral mandible fractures with placement of plates.  Plaintiff denied pain but reported difficulty swallowing solids.  He did not have difficulty with purees or fluids. On examination, CRNP DeFrangesco observed jaw swelling, left greater than the right.  At that time, she ensured Plaintiff had an order for a soft diet provided four times per day.  She also entered an order for Plaintiff to receive ice for his jaw four times per day, as needed, and entered medical restrictions prohibiting Plaintiff from engaging in sports or weightlifting for two weeks.  Thereafter, CRNP DeFrangesco submitted a consult request for Plaintiff to be seen as follow-up at Temple ENT, which was scheduled for April 21, 2016.

On April 11, 2016, Plaintiff was seen in the prison infirmary by Dr. Christian.  Plaintiff advised Dr. Christian that he wanted to return to his housing block.  Dr. Christian explained to Plaintiff that he needed to remain in the infirmary to receive the soft diet ordered.  On April 12, 2016, Plaintiff was seen by the Site Medical Director, Dr. Stephen Wiener, on prison infirmary rounds.  Plaintiff offered no complaints and told Dr. Wiener that he was tolerating his soft diet meals.  Examination revealed that Plaintiff's mouth opened to 2–3 cm, and he exhibited a tight masseter with left greater than right.  As Plaintiff's health was stable, Dr. Wiener cleared him medically to return to the housing block; however, Dr. Wiener ordered that Plaintiff remain on the mechanical soft diet.  Also, that day Plaintiff received a 50 count of Ibuprofen 200mg from commissary.

---

[3]  Clindamycin is an antibiotic, Naproxen is a non-steroidal anti-inflammatory/pain killer, and Percocet is an opioid pain killer.

[4]  Norco is a combination medication used to relieve pain, containing both opioid and non-opioid pain relievers.

3

On April 13, 2016, Plaintiff was released from the infirmary and was provided with a 30-day supply of Motrin[5] from the medical department to keep on his person. He continued to have an active order for Norco, which he was required to pick up from the pill line because it was a controlled substance.

On April 15, 2016, Plaintiff was seen at medical sick call by CRNP DeFrangesco, with complaints that Naproxen was not decreasing his pain. He also reported intermittent spasms to the left side of his face. On examination, CRNP DeFrangesco noted that Plaintiff's swelling had decreased, and he was in no apparent distress. The plan noted was to increase Naproxen to 550mg and add a trial of Baclofen to address his facial spasms. Plaintiff also reported that he did not have a medical pass for his meals. CRNP DeFrangesco issued him a pass for a mechanical soft diet and spoke with Dr. Christian regarding Plaintiff's pain management. Dr. Christian was aware that Plaintiff's Norco prescription expired that day and agreed to order Norco 5/325mg three times daily for two additional days.

On April 16, 2016, Plaintiff was placed in the restrictive housing unit ("RHU") under administrative custody. On April 19, 2016, Plaintiff was seen in a medical sick call by Dr. Golsorkhi for mandibular pain. At that time, Dr. Golsorkhi renewed Plaintiff's Norco prescription for an additional four days.

On April 21, 2016, Plaintiff was seen by Dr. Roehm at the Temple ENT. Plaintiff complained that his teeth were not fitting together; however, he was able to chew on the right. On examination, Dr. Roehm observed that the left buccal mucosa incision was healing well, and the sutures were in place. The external incision of the left cheek was also healing well, and the sutures were removed. Dr. Roehm noted that the swelling in the left cheek had significantly decreased since the surgery. Dr. Roehm ordered an x-ray of the jaw and asked that Plaintiff bring the results to his follow-up visit in two weeks. The next day, Dr. Christian submitted a request for Plaintiff to have a dental x-ray secondary to his recent mandible fracture. He also submitted a consult request for Plaintiff to be seen by Dr. Roehm at Temple ENT for follow-up. The follow-up visit was scheduled for May 12, 2016.

On April 23, 2016, Plaintiff asked Sarah Farrell-Gow, CRNP, to increase his dose of Norco and stated that he "should be getting soft food in a snack" in addition to his meals. CRNP Farrell-Gow wrote that she would defer any decisions regarding Plaintiff's Norco to Dr. Wiener and signed him up for the Doctor's Line for pain management. With regard to his snack request, CRNP Farrell-Gow wrote that she felt Plaintiff was far enough from his original surgery date to tolerate a regular diet. Plaintiff also had the Panorex dental x-ray requested by Dr. Christian. The prison dentist, Dr. Michael Bianco, DDS, reviewed the x-ray and noted that the films showed a bilateral fracture of the mandible. The right side exhibited

---

[5] Motrin is a brand name of Ibuprofen.

incomplete communitive fracture. The left side showed four fixation screws that were stabilizing a complete fracture.

On April 25, 2016, Plaintiff was seen at a dental sick call by Dr. Bianco. Dr. Bianco noted that Dr. Christian made a request to dental for Plaintiff to have a Panorex X-ray for his recent mandibular fracture. He also noted that Plaintiff had a right incomplete comminuted fracture of the right mandible in area of Tooth 32, left mandibular fracture that required an open reduction internal fixation surgery with two splints, and a complete fracture of posterior mandible. Plaintiff reported occasional swelling and right mandible pain. In response to Plaintiff's request for pain medication, Dr. Bianco renewed Baclofen for ten days and renewed Norco for an additional two days.

On April 29, 2016, Plaintiff was seen by Dr. Christian on the Doctor's Line to address Plaintiff's request for renewal of Norco for post-operative pain. Because three weeks had passed since the surgery, Dr. Christian did not believe that continued use of narcotics was necessary. However, he agreed to increase Plaintiff's non-steroidal anti-inflammatory drugs ("NSAIDs") dosage and prescribed Motrin 600mg three times per day through May 17, 2016.

On May 3, 2016, Plaintiff was seen on the RHU sick call by Dr. Christian. Plaintiff requested stronger medications for his pain. Dr. Christian noted that Plaintiff was in no apparent distress,[6] and that his facial symmetry had no swelling.

On May 6, 2016, Plaintiff was seen on a medical sick call by Sherin Thomas, PA-C. Plaintiff reported that he had been on a hunger strike for three days and missed eight meals because he was "frustrated with a lot of things–they won't give me my commissary, I'm not getting my phone calls and they won't give me stronger pain meds." Ms. Thomas noted that Plaintiff appeared calm, he was in no acute distress, and his vitals were normal. On examination of Plaintiff, Ms. Thomas observed tenderness to touch of the bilateral mandible, left greater than right, and difficulty opening his mouth completely. Ms. Thomas explained to Plaintiff that she would not increase his pain medications while he was not eating given the risk of gastrointestinal upset, ulcer formation, and gastrointestinal bleed. The next day, Plaintiff was observed eating breakfast.

On May 11, 2016, Plaintiff was seen by Dr. Christian on an RHU sick call, where he requested stronger pain medications than Motrin. Dr. Christian denied the request for an increase in pain medications because he did not feel comfortable prescribing narcotics one month post-surgery. However, Dr. Christian encouraged Plaintiff to discuss pain management with Dr. Roehm, his treating ENT.

On May 12, 2016, Plaintiff was seen by Dr. Roehm at Temple ENT for the scheduled follow-up. Plaintiff complained of jaw pain and pain with chewing. Dr.

---

[6] Plaintiff denies that he was not in distress.

Roehm reviewed the Panorex x-ray, which showed good approximation of the fracture and healing. Examination revealed granulation tissue overlying the incision line and mild swelling in the left jaw. Her assessment was that the left mandible fracture was "healing well." She recommended that Plaintiff use a warm compress to the left jaw, continue Ibuprofen (*i.e.*, Motrin) 200mg every six hours for pain, and return to the ENT clinic in one month. Dr. Roehm indicated that she would consider the use of Ultram[7] during their next appointment if his medications did not adequately control his pain.

Upon Plaintiff's return to the prison from Temple University Hospital, Annette Voltz, RN, entered orders for warm compress; however, DOC security advised her that the compress was not permitted in the RHU. She then spoke with Dr. Wiener regarding Plaintiff's pain medications. He told her to order Motrin 600mg three times per day and to have Plaintiff sign up for sick call to adjust any further pain medications.

On May 17, 2016, Plaintiff was seen in RHU medical sick call by Dr. Golsorkhi with complaints of allergies and low back pain. Dr. Golsorkhi noted that Plaintiff did not appear to be in distress at that time, and agreed to renew Plaintiff's prescription for Motrin 600mg three times per day and restarted Plaintiff on Baclofen.

On May 18, 2016, Dr. Christian submitted a consult request for Plaintiff to be seen by Dr. Roehm at Temple ENT. Although the consult was scheduled for June 29, 2016, it was subsequently cancelled by the DOC when Plaintiff was transferred to SCI-Mahanoy.

On May 24, 2016, Plaintiff was seen by Dr. Golsorkhi on a medical sick call in the RHU, at which time Plaintiff asked to have his pain medication frequency increased to every three hours. Dr. Golsorkhi noted that Plaintiff was already prescribed Motrin 600mg three times per day, as well as Baclofen.[8] He explained to Plaintiff the complications associated with high doses of NSAIDs, and advised him that he was already prescribed too high of a dose. As a result, he did not agree to increase Plaintiff's medications. Dr. Golsorkhi specifically recalls that Plaintiff was concerned about facial "deformity" during this visit. On visual examination of the exterior of Plaintiff's face, Dr. Golsorkhi noted that he did not observe any swelling or deformity; notwithstanding, he advised Plaintiff to ask the dentist to examine him more thoroughly inasmuch as the dentist was more experienced in identifying and treating any jaw or dental-related deformities.

During RHU rounds on May 25, 2016, Plaintiff asked Dr. Christian for a referral to be seen at dental sick call which Dr. Christian agreed to do and entered

---

[7]   Ultram is an opioid pain reliever.

[8]   As addressed below, Plaintiff disputes that he was given his prescribed medication in the frequency prescribed. Specifically, Plaintiff denies that he was given Motrin three times per day.

an order for the same. On May 26, 2016, DOC dentist Dr. Ronald Burkholder, DDS, noted that Dr. Christian requested that he see Plaintiff at dental sick call. Dr. Burkholder reviewed Plaintiff's chart and the X-rays taken that day, noting that Plaintiff had already been seen by the offsite oral surgeon and had future appointments scheduled. He recommended that Plaintiff see him in ten days at dental sick call.

On June 1, 2016, Dr. Golsorkhi renewed Plaintiff's prescription for Baclofen for an additional week. On June 8, 2016, Plaintiff was scheduled to see Dr. Burkholder at dental sick call; however, he was not taken to his appointment. On June 10, 2016, Dr. Wiener called Dr. Roehm's office at Temple concerning a panoramic X-ray taken at SCI-Graterford that showed a screw possibly going through the molar socket. The nurse who answered the phone advised Dr. Wiener that she would contact Dr. Roehm and have her call back to schedule a follow-up visit as soon as possible to address this concern and to rule out an abscess.

On June 13, 2016, Dr. Christian submitted a consult request for Plaintiff to undergo a CT scan to rule out molar abscess. The CT was scheduled for June 27, 2016. On June 16, 2016, Plaintiff was seen by DOC dentist Dr. Bianco for tooth pain and bleeding, which Plaintiff believed were complications from his recent oral surgery. Dr. Bianco noted that the X-rays showed two possible fixation screws driven into Tooth 32, and that Dr. Christian had ordered the CT to determine the proximity of the plate fixation screws to Tooth 32. At that time, Plaintiff complained of limited mouth opening to 1.5 inches and had visible swelling around the left angle of the mandible. Dr. Bianco agreed that further evaluation was needed, and that Dr. Christian had already requested a CT and ENT follow-up. The plan was to refer Plaintiff to the onsite oral surgeon for evaluation of his condition and for recommendations to alleviate his discomfort. Dr. Bianco ordered a soft diet, Penicillin, and Motrin 300mg four times daily for ten days.

On June 21, 2016, Plaintiff was transferred to SCI-Mahanoy. Plaintiff conceded that he received some kind of pain medication every day from the date of his surgery (April 8, 2016) until his transfer to SCI-Mahanoy (June 21, 2016). He also conceded that Moving Defendants were not responsible for distributing his medications.

**LEGAL STANDARD**

Rule 56 governs summary judgment motion practice. Fed. R. Civ. P. 56. Specifically, this Rule provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* A fact is "material" if proof of its existence or non-existence might affect the outcome of the

litigation, and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. When evaluating a motion under Rule 56, the court must view the evidence in the light most favorable to the nonmoving party. *Galena*, 638 F.3d at 196.

Pursuant to Rule 56, the movant bears the initial burden of informing the court of the basis for the motion and identifying those portions of the record that the movant "believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant can meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case." *Id.* at 322. After the movant has met its initial burden, summary judgment is appropriate if the nonmoving party fails to rebut the movant's claim by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" that show a genuine issue of material fact or by "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c)(1)(A)–(B). The nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The nonmoving party may not rely on "bare assertions, conclusory allegations or suspicions," *Fireman's Ins. Co. of Newark v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982), or rest on the allegations in the pleadings, *Celotex*, 477 U.S. at 324. Rather, the nonmoving party must "go beyond the pleadings" and, either by affidavits, depositions, answers to interrogatories, or admissions on file, "designate 'specific facts showing that there is a genuine issue for trial.'" *Id.*

**DISCUSSION**

As stated, Plaintiff asserts civil rights claims against Drs. Christian and Golsorkhi premised on his allegations that they exhibited deliberate indifference to his serious medical needs by (1) failing to provide pain medication stronger than Motrin and (2) failing to ensure that he received his prescriptions in the frequency prescribed. Moving Defendants argue that Plaintiff has failed to present evidence sufficient to meet his summary judgment burden with respect the requisite showing of deliberate indifference. For the reasons set forth below, this Court agrees with Moving Defendants.

To maintain a cause of action under § 1983, a plaintiff "must allege the violation of a right secured by the Constitution and/or laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988); *see also* 42 U.S.C. § 1983. The Eighth Amendment, the constitutional basis underlying Plaintiff's claims, prohibits cruel and unusual punishment. U.S. Const. amend. VIII. Consistent with the Eighth Amendment, prison officials must provide basic medical treatment to prisoners. *See Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). In *Estelle*, the Supreme Court articulated the standard courts must apply to a prisoner's § 1983 claim premised on inadequate medical care:

> In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend "evolving standards of decency" in violation of the Eighth Amendment.

*Estelle*, 429 U.S. at 106 (citation omitted). Thus, the question "under the Eighth Amendment is whether prison officials, acting with deliberate indifference, exposed a prisoner to a sufficiently

9

substantial 'risk of serious damage to his future health.'" *See Farmer v. Brennan*, 511 U.S. 825, 843 (1994) (quoting *Helling v. McKinney*, 509 U.S. 25, 35 (1993)).

Deliberate indifference requires that the defendant to have been subjectively aware of the risk of harm to the inmate and to have consciously disregarded that risk. *Atkinson v. Taylor*, 316 F.3d 257, 262 (3d Cir. 2003) (citing *Farmer*, 511 U.S. at 837). As such, a prison official can only be held liable under the Eighth Amendment where "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. Further, a prison official's "failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Id.* at 838. In addition, a plaintiff must show that each defendant was personally involved in depriving the plaintiff of his rights. *Evancho v. Fischer*, 423 F.3d 347, 353 (3d Cir. 2005).

It is a "well-established rule that mere disagreements over medical judgment do not state Eighth Amendment claims." *White v. Napoleon*, 897 F.2d 103, 110 (3d Cir. 1990); *see also Spruill v. Gillis*, 372 F.3d 218, 235 (3d Cir. 2004) (holding that "mere disagreement as to the proper medical treatment" is insufficient to establish an Eighth Amendment violation). Prison medical authorities are "afford[ed] considerable latitude" in the diagnosis and treatment of the medical problems of inmate patients. *Inmates of Allegheny Cnty. Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979). "Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *United States ex rel. Walker v. Fayette Cnty.*, 599 F.2d 573, 575 n.2 (3d Cir. 1979) (citation omitted). Claims of mere negligence or

medical malpractice do not constitute deliberate indifference. *See Singletary v. Pa. Dep't of Corr.*, 266 F.3d 186, 193 n.2 (3d Cir. 2001) (citation omitted).

To support his deliberate indifference claims against Dr. Christian and Dr. Golsorkhi, Plaintiff baldly asserts—without any citation to record evidence—that they neglected to review Plaintiff's medication records that showed "Plaintiff was not receiving his pain medication." (Pl.'s Resp. in Opp., ECF 115, at pp. 6–7).[9] As the undisputed record demonstrates, however, Plaintiff received consistent medical attention and treatment from the various medical personnel at SCI-Graterford (including Dr. Christian and Dr. Golsorkhi) from the moment he first sought medical attention following the injury to his jaw until he was transferred out of SCI-Graterford. Specifically, upon Plaintiff's return to SCI-Graterford on April 8, 2016, following his oral surgery at Temple University Hospital, Dr. Christian and Dr. Golsorkhi were made aware of Temple University Hospital's discharge instructions and entered orders to ensure that Plaintiff was prescribed each medication that had been recommended by Dr. Roehm. These prescriptions included Peridex, Clindamycin, Naproxen 375mg twice per day, and Norco 5/325mg four times per day. In the months that followed, Plaintiff was prescribed the following medications while at SCI-Graterford:

- April 8, 2016 – April 15, 2016: Dr. Christian prescribed Norco 5/325 four times per day.

---

[9] It is well-established that a plaintiff must support each factual assertion or dispute with either a citation to the record or by showing that the materials cited do not establish the absence or the presence of a disputed fact. Fed. R. Civ. P. 56(c)(1). Here, Plaintiff provides no record citation to support his contention that he was not receiving his prescriptions as prescribed. As frequently noted by courts when addressing motions for summary judgment, including the United States Court of Appeals for the Third Circuit, "judges are not like pigs, hunting for truffles buried in the record." *DeShields v. Int'l Resort Props. Ltd.*, 463 F. App'x 117, 120 (3d Cir. 2012) (citations omitted); *Liberty Res., Inc. v. City of Phila.*, 2021 WL 4989700, at *2 (E.D. Pa. Oct. 27, 2021). If factual support for Plaintiff's contention exists in the record, it is "incumbent upon [him] to direct the District Court's attention to those facts." *DeShields*, 463 F. App'x at 120.

11

- April 8, 2016 – April 15, 2016: Dr. Christian prescribed Naproxen 375mg twice per day.
- April 15, 2016 – April 29, 2016: CRNP DeFrangesco prescribed Naproxen 550mg twice per day (an increased dose).
- April 15, 2016 – April 24, 2016: CRNP DeFrangesco prescribed Baclofen.
- April 15, 2016 – April 17, 2016: Dr. Christian prescribed Norco 5/325 twice per day.
- April 19, 2016 – April 22, 2016: Dr. Golsorkhi prescribed Norco 5/325 twice per day.
- April 25, 2016 – April 27, 2016: Dr. Bianco prescribed Norco 5/325 twice per day.
- April 25, 2016 – May 4, 2016: PA Kaminsky prescribed Baclofen.
- April 29, 2016 – May 17, 2016: Dr. Christian ordered Motrin/Ibuprofen 600mg three times per day (a higher dose than the Naproxen that was previously prescribed).
- May 17, 2016 – May 31, 2016: Dr. Golsorkhi prescribed Baclofen.
- May 17, 2016 – June 15, 2016: Dr. Christian ordered Motrin/Ibuprofen 600mg three times per day.
- June 1, 2016 – June 7, 2016: Dr. Golsorkhi prescribed Baclofen.
- June 16, 2016 – June 25, 2016: Dr. Bianco ordered Motrin/Ibuprofen 300mg four times per day (a lower total daily dose than previously prescribed).

This record does not support any deliberate indifference by Moving Defendants. Further, Plaintiff concedes that he was never without pain medication from the time of his surgery until his transfer to SCI-Mahanoy.

Notwithstanding this clear record of regular and consistent medical attention to his complaints, Plaintiff argues that he was not given the type of pain medication that he now contends he should have received. Notably, Plaintiff does not proffer any evidence by way of an expert or treating physician to support his own non-professional opinion that he should have been prescribed

stronger pain medication. Indeed, Plaintiff concedes that no provider has ever recommended or prescribed any stronger medication or medications at higher doses than those prescribed by Drs. Christian and Golsorkhi. Further, both Dr. Christian and Dr. Golsorkhi provided unrefuted testimony that they exercised their sound professional judgments when declining Plaintiff's requests to prescribe additional opioids as part of Plaintiff's pain management and, further, provided Plaintiff their medical opinions and reasons for not acquiescing to his request. At best, Plaintiff has demonstrated *only* his own disagreement with the professional judgment of his medical providers with respect to the appropriate treatment and course of his pain management. However, "it is well established that as long as a physician exercises professional judgment his behavior will not violate a prisoner's constitutional rights." *Brown v. Borough of Chambersburg*, 903 F.2d 274, 278 (3d Cir. 1990) (citing *Youngberg v. Romeo*, 457 U.S. 307, 322–23 (1982)). It is equally well-settled that a plaintiff's mere disagreement with a medical provider's course of treatment is insufficient to establish a constitutional violation. *White*, 897 F.2d at 110. Under this governing law, Plaintiff has not met his burden with respect to his claims of deliberate indifference by Moving Defendants.

Despite the clear record of regular and consistent medical care, Plaintiff also argues that Moving Defendants exhibited deliberate indifference to his serious medical needs by failing to ensure that he was given his prescriptions at the frequencies prescribed. Specifically, Plaintiff contends that he often only received his prescription for Ibuprofen twice a day, rather than three times a day as prescribed by Drs. Christian and Golsorkhi. Notably, Plaintiff fails to identify the evidence that purportedly supports his contention that he only received his Ibuprofen twice a day. Plaintiff merely references his "Medication Administration Records" without providing record

cites to support his factual contention.[10] Regardless, accepting Plaintiff's bald factual contention as true, he similarly provides no evidence showing that Moving Defendants, who prescribed Plaintiff's medications, were responsible for delivering Plaintiff's medications to him or were aware or made aware that he was not receiving the prescribed medications at the frequencies prescribed. To the contrary, Plaintiff concedes that while the Moving Defendants prescribed his medications, it was the DOC-employed nurses who were responsible for delivering the medications to Plaintiff. In addition, Moving Defendants provided unrefuted evidence that they were unaware that Plaintiff was not receiving his pain medications at the frequency they prescribed. As noted, it is well-settled that a prison official can only be held liable under the Eighth Amendment where "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. Further, a prison official's "failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Id.* at 838. Because Plaintiff has not provided any evidence from which one could reasonably infer that Moving Defendants were unaware that their prescription orders were not being followed by the prison nursing staff as alleged, Plaintiff has not satisfied the requisite subjective component of the deliberate indifference standard. Accordingly, Moving Defendants' motion for summary judgment is granted.

**CONCLUSION**

For the foregoing reasons, Moving Defendants' motion for summary judgment is granted. An Order consistent with this Memorandum Opinion follows. *NITZA I. QUIÑONES ALEJANDRO*, J.

---

10    *See supra* note 9.